Peter ODIMA, Plaintiff–Appellee,

v.

**WESTIN TUCSON HOTEL, a Delaware corporation, aka Westin Hotels, Defendant–Appellant.**

No. 94–15839.

United States Court of Appeals, Ninth Circuit.

Submitted Nov. 8, 1994 *.

Decided April 28, 1995.

---

* The panel unanimously finds this case suitable for submission on the record and briefs and without oral argument. Fed.R.App. P. 34(a), Ninth Circuit R. 34–4.

Marshall W. Anstandig and Diane M. Dear, Bryan Cave, Phoenix, AZ, for defendant-appellant.

Carole A. Summers, Miller, Pitt & McAnally, Tucson, AZ, for plaintiff-appellee.

Before: WIGGINS, O'SCANNLAIN, and FERNANDEZ, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We revisit a Title VII employment discrimination case which comes back to us after remand for further findings surrounding the plaintiff's six attempts to transfer out of a hotel laundry and into the hotel's accounting department.

I

Odima is a Nigerian-born black man who was employed in the laundry at the Westin La Paloma Resort in Tucson, Arizona. After six unsuccessful attempts to transfer out of the laundry, Odima filed suit claiming that Westin had discriminated against him on the basis of race and nationality in violation of 42 U.S.C. § 1981, Title VII, and Arizona law. After a two-and-one-half day bench trial, the district court entered judgment in favor of Odima on his Title VII and section 1981 claims. The district court entered judgment in favor of Westin on Odima's claims for wrongful termination, constructive discharge, retaliation, and intentional infliction of emotional distress. *Odima v. Westin Tucson Hotel*, No. CV-89-360-TUC-WCB (D.Ariz. Mar. 29, 1991) (*"Odima I"*).

Westin appealed, and we reversed and remanded. In *Odima v. Westin Tucson Hotel Co.*, 991 F.2d 595 (9th Cir.1993) (*"Odima II"*), we held that the district court improperly concluded that because one of the reasons Westin offered for not transferring Odima was false, that the other reasons Westin proffered were necessarily also false. Consequently, we instructed the district court to consider Odima's claim of discrimination with regard to each of the transfer decisions separately, setting forth specific findings of fact with regard to each of Westin's proffered explanations. *Id.* at 600.

On remand, the district court issued a lengthy memorandum opinion and order, again concluding that Westin had discriminated against Odima on the basis of race and national origin in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, the Arizona Civil Rights Act, A.R.S. § 41-1461 *et seq.*, and 42 U.S.C. § 1981.

*Odima v. Westin Tucson Hotel,* No. CV–89–360–TUC–WDB (D.Ariz. Feb. 22, 1994) (*"Odima III "*). This time, the district judge set forth detailed findings of fact regarding each of the positions Odima sought and Westin's proffered explanations for not transferring him. As for remedies, the district court ordered Westin to instate [1] Odima in the first available position as a night auditor, accounts receivable clerk or purchasing/receiving clerk. The district court further ordered Westin to provide Odima with backpay, front pay, $10,000 in compensatory damages, and attorneys' fees and costs.

Westin challenges the district court's finding of discrimination, the imposition of liability under 42 U.S.C. § 1981, the district court's choice of remedies, and its award of attorneys' fees.

## II

Odima completed his high school education in Nigeria where classes are conducted in English, the country's official language. In 1977, Odima was permitted to immigrate to England because he was a good student. There he enrolled in the business studies program at the College of Printing in London where he studied business and accounting. He then enrolled at Hammerschmidt West London College where he studied accounting, economics, business law, computers and computer languages, sociology, psychology, math, and English. He then moved to Glasgow, Scotland where he enrolled in Reid Kerr College studying accounting, economics, law, marketing, purchasing and supply, English, and math.

While in England, Odima worked for one-and-one-half years at Sangas Pharmaceutical Company, where his duties included receiving, loading, unloading, pricing, sales, stocking and inventory controls. He also owned his own business which exported used cars to Nigeria until a 30% surcharge on imported used cars made the business unprofitable.

In 1982, Odima lawfully immigrated to the United States and settled in Detroit. There he enrolled in Wayne County Community College, completing 24 units of credits. Desiring to escape the cold winters of Detroit, Odima moved to Tucson where he attended Pima Community College and completed 77 units of credits. He qualified for an associate degree at Pima College; however, he elected to transfer his credits to the University of Arizona in pursuit of a bachelor's degree in finance. He completed 29 units at the University of Arizona. There came a time when he could no longer afford the tuition, so he audited classes without receiving academic credit. While at the University of Arizona, Odima worked for one year as a purchasing clerk in the University's medical and scientific storeroom.

By the summer of 1986, Odima was married and the father of three children. He was forced to leave the University to seek full-time employment in order to support his family. Consequently, in August 1986, he applied for an accounting position at the new Westin La Paloma Resort. He was told, however, that the only openings were in the laundry, which was staffed almost entirely by blacks and Hispanics, but that he could seek a transfer to the accounting department after six months. Odima accepted the position in the laundry.

In March 1987, Odima applied for a Night Auditor position in the accounting department. The position required a high school education and the ability to operate a 10–key calculator. Applicants with computer experience were preferred. Odima possessed all these qualifications. The interviewer for this position said that Odima was "acceptable, and would be considered in the future."

Kevin Dreke, a white male, got the job. Dreke was employed at Westin in grounds maintenance. Dreke had requested a transfer to Night Auditor in July 1986, but his request was not granted because Westin eliminated the position Dreke was seeking. According to Westin's policy, when a transfer request was not granted, that request was considered dead, and the applicant would be required to complete a new application. In contravention of that policy, Westin considered Dreke's 1986 transfer application.

---

**1.** Although not commonly used, the term "instate," as opposed to "reinstate," refers to the placing of an employee in a position that he has not previously occupied.

Dreke had taken a two-year technical program which included two accounting classes and a three-week internship as a warehouse helper in an automotive warehouse. He had no accounting experience, although Westin's Accounting Division Supervisor, Helmer Dahle testified that Dreke was "a little bit more qualified" than Odima because Dreke had had "practical experience" in accounting in "a position he held in Wisconsin." The district court, noting that the experience was not reflected in the resume or cover letter Dreke submitted, found that Odima's qualifications were clearly superior to Dreke's and that Westin unaccountably disregarded its transfer policy by hiring Dreke without requiring him to reapply for a transfer.

In July 1987, Odima requested transfer to a Staff Planning position. Odima did not receive an interview for that position, and the district court found that he was not qualified for it.

In August 1987, Odima received his first annual performance evaluation by his laundry supervisor, Larry Garcia. Mr. Garcia wrote that Odima was "very experienced," "one of his fastest workers," that he had "knowledge of all positions," that his quality was "above standards," and that he was a very productive employee who "follows directions well."

Later that month Odima requested a transfer to an Accounts Receivable position in the accounting department. The position required a high school education and the ability to operate a 10-key calculator. Odima met these qualifications. Receivable experience was preferred and computer knowledge was helpful. Odima also had these qualifications. According to the district court, Odima was interviewed on August 26 and was told at that time that another candidate was more qualified. On September 8, two weeks after Odima had been told that another candidate was more qualified, Deanna Searer, a white female, got the job. The district court found that Ms. Searer was qualified but that she had not even applied for the position when Odima was rejected.

On September 16, 1987, Odima requested a transfer to a Purchasing/Receiving Clerk position in the accounting department. Odima's supervisor, Mr. Garcia, in approving the transfer request, noted that Odima exceeded Westin's standards in quantity and quality of work. The position required good organizational skills, good directive skills, two years of shipping and receiving experience, and accounting aptitude. There was occasional guest contact which amounted to 5% of the employee's time. The district court found that Odima "met or exceeded all of these qualifications."

Tim Turbine interviewed Odima for the Purchasing/Receiving position and stated that he had "very good related experience and education," presumably referring to Odima's one-and-one-half years of receiving, pricing, stocking, and inventory control at Sangas Pharmaceutical Company and his one year as a purchasing clerk at the University of Arizona's medical and scientific storeroom. However, Turbine rejected Odima for the reason that Odima had a "heavy accent [which] could inhibit communication."

Instead of Odima, Westin transferred Albert DeRego, a Pacific Islander into the position. The district court found that DeRego had not submitted a request for transfer to the position. The district court further found that DeRego had no experience in purchasing and receiving, though Westin purportedly required two years experience for the position. Consequently, the district court found that "Mr. Odima's qualifications far exceeded those of Mr. DeRego." DeRego had worked for a short time during the summer of 1987 as a runner in Purchasing and Receiving, and Turbine testified that DeRego's brief part-time experience was a factor in choosing him, but when Odima was rejected the only reason Turbine gave was Odima's allegedly "heavy accent" and lack of "communicative skills."

In late November 1987, Ms. Searer left Accounting, and the Accounts Receivable position again opened. Odima's supervisor, Garcia, again recommended Odima highly, stating that "Peter is a hard and dependable worker." Garcia forwarded Odima's request for transfer to Patricia Hall, head of Housekeeping, whose responsibility it was to forward the request to the Human Resources

Division. Ms. Hall failed to do so for ten days; by that time, the position had been filled by Patricia Bailey, a white female.

When Odima learned that Hall had failed to forward his request, he went to see her. The district court found that during the conversation, Hall told Odima to "go back to Africa where you came from. We don't have any job for you here."

Odima then met with Helmer Dahle, Accounting Division Supervisor and David Moffatt, Director of Human Resources, to ask for their assistance in securing a transfer out of the laundry. They told him that his accent was a barrier to *all* positions in the accounting department. They suggested that he go to a speech pathologist.[2] The district court found that "Mr. Odima speaks fluent, understandable English.... His speech was clear and understandable during a whole day on the witness stand during which he underwent probing cross-examination."

When Odima failed to hear further from the accounting department, he went back to see Moffatt. The district court found that Moffatt told Odima that he "should go to a black business to look for a job."

Finally, in April 1988, Odima applied for a job as a Promotions Coordinator, a non-accounting position. Odima was not granted an interview because Westin concluded that he was not qualified for the position. The district court agreed with this assessment.

On December 31, 1987, Odima filed a complaint with the Equal Employment Opportunity Commission of the Arizona Civil Rights Division ("EEOC"). Westin agreed to a no-fault settlement of the proceedings in which it would offer Odima the next available night auditor position. In exchange, Odima would have to relinquish any claims of discrimination against Westin. Odima declined the offer. On December 1, 1988, Odima walked off the job in the laundry and never returned. The immediate reason for the walkout was Odima's erroneous belief that Westin had cheated him on his paycheck.

In concluding that Westin had discriminated against Odima, the district court summarized the evidence as follows:

> [W]hen all the evidence is reviewed—Mr. Odima's exceptional education and experience in accounting-related matters, his outstanding work record at Westin, his clearly superior qualifications to Dreke and DeRego, the disregard by Westin of its transfer policy in the case of Dreke, the rejection of Mr. Odima before Ms. Searer applied, the transfer of Mr. DeRego without a request, the failure to forward Mr. Odima's request in the case of his second Accounts Receivable request, the derogatory remarks by Hall and Moffatt, the pretextual accent defense—it points to but one finding: Mr. Odima was denied his transfer requests to Night Auditor, Accounts Receivable and Purchasing/Receiving because of his race and nationality.

### III

Westin challenges the district court's finding of discrimination. We will not set aside a district court's finding of discrimination unless it is clearly erroneous. *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–1 to 2000e–17, provides that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). In a "disparate treatment" case such as this, the ultimate issue for the district court to decide is "whether 'the defendant intentionally discriminated against the plaintiff.'" *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981)).

---

**2.** The district court noted that Dahle, who spoke with an Austrian accent, had not been required

to undergo speech therapy to advance his career.

In *Burdine*, the Supreme Court articulated the analytical framework to be used by district courts in determining whether discrimination has occurred:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093 (quotation omitted). Here, the parties agree that Odima made out a prima facie case of discrimination and that Westin proffered nondiscriminatory reasons for not choosing Odima. The case centers, then, on the district court's finding that Westin's proffered reasons were pretextual.[3]

■ As a general matter, Westin claims that the district court improperly substituted its judgment of Odima's qualifications for Westin's. This argument is meritless. A district court's finding that a Title VII plaintiff's qualifications were clearly superior to the qualifications of the applicant selected is a proper basis for a finding of discrimination. *Burdine*, 450 U.S. at 259, 101 S.Ct. at 1096–97. Indeed, it was Westin itself that raised the defense that those it hired over Odima were better qualified. How possibly could the district court rule on this defense without comparing Odima's credentials to those of the persons hired? Westin also points to what it perceives as differences between the district court's first opinion and its opinion upon remand; that is, *Odima I* and *Odima III*. However, this court's review is limited to *Odima III*—the district court judgment that Westin is currently appealing. *Adamian v. Lombardi*, 608 F.2d 1224, 1228 (9th Cir.1979), *cert. denied*, 446 U.S. 938, 100 S.Ct. 2158, 64 L.Ed.2d 791 (1980).

We now consider, in turn, the district court's findings of discrimination as to each of the positions for which Odima applied.

### A

■ The district court's conclusion that Westin discriminated against Odima with regard to the Night Auditor position is based on its findings that (1) Odima's qualifications were clearly superior to Dreke's; and (2) Westin unaccountably considered Dreke's old transfer request, contrary to Westin's policy. This conclusion is not clearly erroneous. Dreke's resume showed that his accounting education was limited to two accounting classes. "In contrast," the district court noted, "Mr. Odima had taken several accounting and computer courses and had run his own business for three years." At trial, Dahle testified that Dreke had "practical experience" in accounting in a "position he held in Wisconsin." However, the district court discredited Dahle's testimony because "[t]hat experience was not reflected in Dreke's resume or the letter attached to it."

Finally, Westin claims that it occasionally reconsidered an application for transfer after the application had been rejected; thus, it meant nothing that Westin resurrected Dreke's former application. It is true that the circumstances surrounding Dreke's July 1986 transfer attempt were somewhat unusual. Dreke was not rejected in favor of another applicant; rather, the position he sought was eliminated. Nonetheless, the testimony at trial showed that Westin required an employee complete a new transfer application for each transfer request. That Westin unaccountably considered and granted Dreke's old application when it already had a well-qualified black Nigerian applicant seeking the position supports the district court's finding of discrimination.

---

3. Of course, we recognize that the issue is whether Odima has proved discrimination and that the burden of production shifting rules of *Burdine* do not apply to that determination. *See St. Mary's Honor Ctr. v. Hicks*, —— U.S. ——, ———––—,

113 S.Ct. 2742, 2748–49, 125 L.Ed.2d 407 (1993). We emphasize the pretext portion of the *Burdine* elements because that is where the arguments of the parties have been concentrated.

**1493**

**B**

Turning to the purchasing and receiving position, the district court found that (1) Westin's reliance on Odima's accent was pretextual; (2) Odima's "qualifications far exceeded Mr. DeRego's"; and (3) DeRego did not submit a transfer request. In *Odima II,* we affirmed the district court's finding that Westin's accent justification was pretextual. 991 F.2d at 600. That holding is law of the case, *Merritt v. Mackey,* 932 F.2d 1317, 1320 (9th Cir.1991), and we have no occasion to revisit it.

Further, the district court's conclusion that Odima's qualifications were far superior to DeRego's is not clearly erroneous. The district court accurately found that DeRego had no experience in purchasing and receiving and was hired despite the fact that the position purportedly required two years' experience. In contrast, Odima had two-and-one-half years' experience in purchasing and receiving.

DeRego had worked part-time as a runner in the Purchasing and Receiving Department for a couple of weeks during the prior summer, and Turbine testified that this was a consideration in hiring DeRego. The district court did not clearly err in discrediting that reason, however, because "when Mr. Odima was rejected, the only reason Mr. Turbine gave was 'heavy accent' and 'communicative skills.' "

The district court inferred that DeRego did not submit a request to transfer because (1) no request for a transfer was offered into evidence; and (2) massive documentation was offered by both parties. Westin argues that this inference is clearly erroneous. Westin maintains that DeRego's request for transfer was not introduced as an exhibit only because there was no dispute that DeRego applied for the position in the same way that Odima did. We agree that the district court's finding regarding DeRego's transfer request is somewhat tenuous; however, we need not decide whether it rises to the level of being clearly erroneous because the conclusion of discrimination is easily supported by the district court's other two findings.

**C**

The district court concluded that Westin discriminated against Odima as to the first accounts receivable position because Odima was told that another candidate was more qualified when the other candidate, Deanna Searer, had not even applied at the time that Odima was rejected.

Westin maintains that the district court's finding is based on a misreading of Odima's application. Westin argues that Odima incorrectly signed and dated the form in the section where the interviewer (not the applicant) should sign and date the form. Thus, it appears as though Odima interviewed on the same day that he applied for the position when that is impossible because applications are routed through Housekeeping and the Human Resources Department before being sent to the Hiring Department for consideration.

Even if Westin were correct that Odima signed and dated the form in the wrong place, Westin's argument would not be dispositive because we cannot ascertain upon what information the district court based its conclusion that Odima was rejected before Searer applied. Westin claims that Odima could not have been interviewed on the same day that he filled out the form, but Westin does not tell us on what day he was interviewed. It may still have been before Searer applied.

As it turns out, we need not decide whether the district court's finding of discrimination as to the first accounts receivable position is clearly erroneous because the district court's finding of discrimination as to the second accounts receivable position is not clearly erroneous. The district court based that conclusion on its findings (1) that Patricia Hall of Housekeeping did not inadvertently "lose" Odima's application; and (2) that she told him to go back to Africa where he came from.

Westin claims that the district court's finding that Hall and Moffatt made racist comments to Odima is irrelevant because those comments constitute "stray remarks" by people who did not decide whether Odima would get the transfer he desired. That assertion

is not accurate, however, at least with regard to Hall. First, Hall supervised Larry Garcia who supervised Odima, so Hall was in Odima's direct chain of supervision. Second, even if Hall did not have the formal authority to decide whether Odima obtained a transfer, she had the practical power to do so. By failing to forward Odima's transfer request until the position had been filled, Hall ensured that Odima would not obtain the transfer.

In sum, we conclude that the district court's finding that Westin discriminated against Odima on the basis of race and national origin is not clearly erroneous.

## IV

Westin next challenges the district court's conclusion that it violated 42 U.S.C. § 1981. At the time of trial, *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) interpreted section 1981 as prohibiting discrimination "only in the making and enforcement of contracts." *Id.* at 176, 109 S.Ct. at 2372. The Civil Rights Act of 1991, 105 Stat. 1071, P.L. 102–166 (1991) explicitly rejected *Patterson*'s narrow reading of section 1981; however, the Supreme Court subsequently held that the provision of the Act that overruled *Patterson* was not to be applied retroactively. *Landgraf v. USI Film Products,* — U.S. —, —, 114 S.Ct. 1483, 1508, 128 L.Ed.2d 229 (1994). Because the events at issue here occurred prior to 1991, we apply *Patterson*'s interpretation of the statute to the instant facts.

■ Instructing lower courts to give a "fair and natural reading" to the language of section 1981, the *Patterson* Court held that discriminatory promotions are actionable "[o]nly where the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer." 491 U.S. at 185, 109 S.Ct. at 2377. This court developed its first substantial

elaboration of promotion claims under *Patterson* in *Sitgraves v. Allied–Signal, Inc.,* 953 F.2d 570 (9th Cir.1992). In *Sitgraves,* we observed that *Patterson* "strongly suggests that, in addition to an increase in pay and duties, an actionable promotion claim must involve a meaningful, qualitative change in the contractual relationship." *Id.* at 573. Applying that standard, the court held that the move from a non-supervisory position to a supervisory one is an actionable basis for a section 1981 failure-to-promote claim under *Patterson.* Likewise, "the move from compensation based on hours worked to compensation based on an annual salary constitutes a sufficiently new and different contractual relationship to provide an actionable promotion claim." *Id.* at 574.

Turning to the case before us, we note that the accounting jobs sought by Odima, like his laundry job, were all compensated on an hourly, not a salaried basis. We also conclude that transfers to the Night Auditor and Accounts Receivable positions would have required Odima to perform no supervisory duties. However, Westin's own description of the purchasing and receiving position reveals that Odima would have performed supervisory duties had he been transferred to that position. Thus, under *Sitgraves* we cannot conclude that the district court erred in finding a section 1981 violation.[4]

■ It appears, however, that the district court found Westin to have violated section 1981 with respect to all three transfers. This conclusion we cannot endorse. In *Sitgraves,* two of the plaintiffs worked as "Assembler/Mechanics, classified as a semi-skilled position, and they sought a Mechanical Inspector position, classified as a skilled position." *Id.* at 572–73. Although there were significant differences in pay and job duties between the two positions, both positions were hourly jobs without supervisory responsibility. *Id.* at 573. The *Sitgraves* court concluded that the section 1981 claims of these two plaintiffs "must be considered

---

4. Westin's contention that Odima cannot be awarded damages under § 1981 because he performed some supervisory duties in the laundry is without merit. Evidence adduced at trial suggested that Odima performed minor supervisory duties during a short period when one supervisor

had quit and the replacement had yet to be hired. However, these duties were not part of Odima's contract with Westin, and he was not compensated for performing them. Consequently, Westin cannot rely on them to defeat Odima's § 1981 claim.

barred by the *Patterson* standard" because the promotions "would not have affected essential terms of their contractual arrangements such as the hourly basis of their compensation, the non-supervisory nature of their duties, or the nature of their tenure." *Id.* at 574.

The same is true for the Night Auditor and Accounts Receivable positions here. Transfers to those positions would have involved no change in the form of compensation nor would they have provided Odima with any supervisory responsibilities. Thus, Westin committed no section 1981 violation in refusing to transfer Odima to the above two positions. Because we cannot determine whether the district court's award of $10,000 in compensatory damages is based on the erroneous conclusion that Westin violated section 1981 with respect to the Night Auditor and Accounts Receivable positions, we must remand for more specific findings on this point.

## V

Westin raises several challenges to the relief ordered by the district court. The district court has wide discretion in awarding remedies to make a Title VII plaintiff whole. *Edwards v. Occidental Chem. Corp.,* 892 F.2d 1442, 1448 (9th Cir.1990). We review a district court's award of damages under an abuse of discretion standard. *Id.* We discuss Westin's challenges in turn.

## A

Westin notes that the district court found that Odima had not been constructively discharged, but voluntarily quit his job in the laundry on December 1, 1988. From this fact, Westin argues that any backpay should run only to that date, and not to the date of judgment.

The primary purpose of Title VII is to "make persons whole for injuries suffered on account of unlawful employment discrimination." *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975). Accordingly, Congress granted the courts wide remedial powers under Title VII so that they could "fashion[] ... the

most complete relief possible." *Id.* at 421, 95 S.Ct. at 2373 (quotations omitted). Indeed, the Supreme Court has held that, "given a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Id.*

An employee who has been discriminatorily denied an opportunity for a promotion ordinarily may not collect backpay "for periods beyond that employee's voluntary resignation unless the employee demonstrates that she was constructively discharged by the employer." *Thorne v. City of El Segundo,* 802 F.2d 1131, 1134 (9th Cir. 1986). That doctrine does not apply, however, when the employee "was preparing to enter an entirely different career" with the same employer. *Id.*

In *Thorne,* the plaintiff worked as a clerk-typist for the police department and sought a position as a police officer. Despite her ranking as second-highest among applicants on the oral and written tests, and her satisfactory completion of physical agility tests, the department disqualified the plaintiff from consideration. The plaintiff voluntarily quit her typist position four months later. After entering judgment for the plaintiff on her Title VII claim, the district court awarded the plaintiff backpay only until she voluntarily quit. This court reversed the limitation on backpay. We first noted that, in many circumstances, legitimate policy reasons support limiting awards of backpay.

> The purposes of Title VII are best served when parties, *where possible,* attack discrimination within the context of their existing employment relationships. An employee, faced with an obstacle in the logical progression and development of a career should not quit at the first sign of institutional discrimination.

*Id.* (emphasis in original). However, in light of the policy underlying the restriction on backpay, we concluded that the restriction was inapplicable in *Thorne* because the employee sought "a materially different posi-

tion." *Id.* at 1135. "Had Thorne remained a clerk-typist for the police department, she would not have been in any better position to attack discrimination in police officer hiring than any other applicant who worked for another city agency or for an employer in the private sector." *Id.* at 1134. We held that an employer's discriminatory denial of the employee's opportunity to "enter an entirely different career," constitutes "a refusal to hire"; thus, the limitation on backpay in promotion cases does not apply. *Id.*[5]

The same is true here. Odima's efforts to transfer out of the laundry and into the Accounting Division were attempts to enter an entirely new career.[6] Each position Odima sought required specific advanced education or experience levels. Odima would have transferred to a different department, a different location, and would have worked under entirely different management. In essence, Odima would have moved from an unskilled, manual labor environment, into the skilled professional arena. Thus, under *Thorne,* the district court correctly awarded Odima backpay extending beyond the date of

his quit because the discriminatory refusal to offer Odima a position in accounting must be considered a refusal to hire rather than a refusal to promote.[7] *Id.*

## B

Westin next argues that Odima failed to mitigate damages as required by Title VII.

■ Westin first claims that Odima failed to mitigate damages by refusing Westin's offer of the first available Night Auditor position as part of the no-fault settlement negotiated with the Arizona Civil Rights Division in September 1988.[8] However, the job offer was expressly conditioned upon Odima relinquishing his discrimination claims against Westin, including his right to pursue remedies in court. The Supreme Court has stated that a "claimant's obligation to minimize damages ... does not require him to settle his claim against the employer, in whole or in part. Thus, an applicant ... is not required to accept a job offered by the employer on the condition that his claims

---

5. The *Thorne* test, dealing with backpay under Title VII, is different from the *Patterson* test interpreting 42 U.S.C. § 1981. Because section 1981 prohibits discrimination in the "making and enforcement of contracts," *Patterson* requires us to examine whether a promotion would have created "a new and distinct relation between the employee and employer." *Patterson,* 491 U.S. at 185, 109 S.Ct. at 2377. Thus, the prototypical example of a new and distinct relation is the move from associate to partner in a law firm. *Sitgraves,* 953 F.2d at 570. By contrast, when determining the appropriateness of a backpay award in a promotion case, *Thorne* requires that we determine whether the applicant was attempting to embark upon an "entirely different career." *Thorne,* 802 F.2d at 1134. Consequently, an associate in a law firm who was seeking partnership status would meet the *Patterson* test but would not satisfy the *Thorne* test.

6. Indeed, David Moffatt testified that both he and Helmer Dahle advised Odima that the perfect way to start his new *career* in Accounting at Westin was through a night auditor position.

7. We note also that the policy underlying the restriction on backpay is even less applicable here than in *Thorne.* As we said in *Thorne,* "[a]n employee faced with an obstacle in the logical progression and development of a career should not quit at the first sign of institutional discrimi-

nation." *Thorne,* 802 F.2d at 1134. Here, not only was Odima seeking an entirely new career, but he by no means "quit at the first sign of institutional discrimination." Odima did not quit after he was rejected six times for transfer out of the laundry. On the contrary, he repeatedly sought out the Supervisor of the Accounting Division and the Director of Human Resources for assistance. He also did not quit after Hall and Moffatt made racist comments to him. Indeed, Odima continued to work in the laundry for a full year after he filed his EEOC complaint. These facts hardly portray a man who impetuously quit at the first hint of discrimination.

8. Westin also claims that it offered Odima a job in December 1987 that he refused. The record indicates otherwise. The alleged offer came at the December 1987 meeting that Odima had with Moffatt and Dahle. However, Dahle testified that he merely told Odima that *if* a position opened in accounting, and *if* Odima were the most qualified applicant, Odima would be offered the job. RT 179 at 158–59. Moffatt testified that Odima misunderstood the conversation and believed that Dahle and Moffatt had promised him the next available position. When Odima subsequently asked Moffatt about the position, Moffatt testified that "I explained to Peter that we didn't promise him a position. We had promised him that he would be considered if and when a position became available." RT 179 at 223.

against the employer be compromised." *Ford Motor Co. v. EEOC,* 458 U.S. 219, 232 n. 18, 102 S.Ct. 3057, 3066 n. 18, 73 L.Ed.2d 721 (1982).

 Westin next claims that Odima's post-trial deposition testimony demonstrates that Odima failed adequately to seek other employment. Title VII "requires the claimant to use reasonable diligence in finding other suitable employment." *Id.* at 231, 102 S.Ct. at 3065. However, Westin has the burden of proving that Odima failed to mitigate his damages. *Sangster v. United Air Lines, Inc.,* 633 F.2d 864, 868 (9th Cir.1980), *cert. denied,* 451 U.S. 971, 101 S.Ct. 2048, 68 L.Ed.2d 350 (1981). To satisfy this burden, Westin has to prove "that, based on undisputed facts in the record, during the time in question there were substantially equivalent jobs available, which [the plaintiff] could have obtained, *and* that [the plaintiff] failed to use reasonable diligence in seeking one." *EEOC v. Farmer Bros. Co.,* 31 F.3d 891, 906 (9th Cir.1994) (emphasis in original). *See also Edwards v. Occidental Chem. Corp.,* 892 F.2d 1442, 1449 (9th Cir.1990); *Sias v. City Demonstration Agency,* 588 F.2d 692, 696 (9th Cir.1978). The district court did not abuse its discretion in finding that Westin failed to satisfy the above test.

Westin presented no evidence as to the availability of comparable employment. Westin contends that it did not need to present such evidence because "[i]f an employer proves that a plaintiff failed to look for work, the employer is not required to prove that jobs were available." Westin notably cites no Ninth Circuit authority for this purported exception to the general rule, and we can find none. That need not trouble us, however, because Westin fails to satisfy the rule that it urges in any event. Odima did not fail to look for work. After leaving the laundry, Odima sold African artifacts and engaged in some day labor. He also applied for an accounting position at Ventana Canyon; he utilized the career placement services of the University of Arizona and Pima Community College; he regularly reviewed the classified ads, and he sent his resume to friends and to his brother who was working in Nigeria with Shell Oil in order to help him find a position.

On these facts, we cannot conclude that the district court abused its discretion in finding that Westin failed to meet its burden of proving that Odima did not mitigate damages.

## C

Westin argues that the district court exceeded this court's *Odima II* mandate by ordering Odima instated into the first opening in Accounts Receivable, Purchasing/Receiving or Night Auditor. Westin notes that in *Odima I,* the district court ordered Odima instated only into the next available purchasing and receiving position.

 When a case has been decided by an appellate court and remanded, the court to which it is remanded must proceed in accordance with the mandate and such law of the case as was established by the appellate court. *Firth v. United States,* 554 F.2d 990, 993 (9th Cir.1977). "[T]his court has held that a mandate is controlling as to all matters within its compass, while leaving any issue not expressly or impliedly disposed of on appeal available for consideration by the trial court on remand." *Id.* at 993–94.

 In *Odima II,* we remanded the case to the district court with instructions for the court to make specific findings regarding each reason proffered for Westin's refusal to transfer Odima. Westin had challenged the district court's remedies in *Odima II,* yet we explicitly stated that because "we vacate the judgment and remand for further findings, we need not consider Westin's arguments that the district court abused its discretion in fashioning remedies and in calculating attorneys' fees." 991 F.2d at 602. Thus, it is clear that our mandate did not encompass the district court's choice of remedies.

## D

 Citing the principle that "he who comes into equity must come with clean hands," *Ellenburg v. Brockway, Inc.,* 763 F.2d 1091, 1097 (9th Cir.1985), Westin maintains that Odima is not entitled to an equitable remedy under Title VII because Westin claims that Odima lied on his applications

and resume. In particular, Westin claims that Odima incorrectly stated that he had an associate's degree from Pima Community College and he was attending the University of Arizona at the time of his application.

It is undisputed that Odima satisfied all of the requirements for an associate's degree, but did not register to receive the diploma because he did not want to incur the cost of doing so. It is also undisputed that Odima transferred to the University of Arizona from Pima Community College, attended classes at the University, had not yet earned his degree, but was in a degree program at the University. Westin apparently quibbles with the fact that Odima did not make it entirely clear in his application that he was not actually enrolled in any classes for the then-current semester. On these facts we cannot conclude that the district court abused its discretion in finding that equitable remedies were not barred because at worst, "[s]ome of the language which appears on Mr. Odima's resume may be a bit misleading to the casual reader."

### E

■ Westin next argues that instatement is an inappropriate remedy because Odima is no longer qualified for the job. However, Westin presents absolutely no evidence to suggest that Odima is incapable of performing the accounting tasks for which he would be responsible. Westin relies instead on Odima's post-trial deposition testimony, and maintains that "Odima admits that he would need vocational training before he could perform ... basic accounting functions." Westin misreads Odima's testimony, however. Odima merely stated that the "legal tussle" had been hard on him and that when he was instated he would have to work on resolving family problems that have resulted from his recent homelessness. The district court's order of instatement was not an abuse of discretion.

### F

Finally, Westin contends that there was no evidence to support the awards of backpay, front pay or compensatory damages.

■ Westin's contention as to backpay and front pay is meritless. Following trial, by order of the court, the parties *jointly* submitted a calculation of damages. Westin made no objection at the time that the amount was erroneous and seemingly does not now challenge the accuracy of the calculation on appeal. The fact that information on comparative wage rates was not submitted to the court during the trial on liability, but rather afterwards, is of no moment, especially· given that this was a bench trial that the district court tried on an expedited basis.

■ Westin's challenge to the district court's award of $10,000 in compensatory damages for Westin's violation of 42 U.S.C. § 1981 is likewise without merit. The district court ordered this award to compensate Odima for his "pain, suffering and humiliation." Westin points to one portion of the record, where Odima testifies as to the pain and suffering he experienced as a result of his unemployment, and maintains that the emotional injuries Odima suffered resulted from his quitting the job, not from Westin's discrimination. However, Westin neglects Odima's other testimony. Odima testified as to his emotional distress upon learning that Pat Hall had failed to forward his transfer application, and his feelings of frustration, helplessness, and isolation after his six transfer applications had been rejected and the racist comments were made. We thus conclude that sufficient evidence supports the damages awarded.[9]

### VI

■ Westin challenges the district court's award of attorneys' fees. A district court's award of attorneys' fees is reviewed for an abuse of discretion. *Thorne v. City of El Segundo*, 802 F.2d 1131, 1141 (9th Cir.1986).

---

9. As noted above, we must remand on this point in any event because compensatory damages under § 1981 can only be based on Westin's refusal to hire Odima for the purchasing and receiving positions, not the other positions that Odima sought. That issue is distinct from the point that Westin urges here; that is, that insufficient factual evidence supports the award.

First, Westin contends that Odima should not have received attorneys' fees which resulted from work performed on Odima's unsuccessful state tort claims. Where a plaintiff prevails on some claims and not on others in an employment discrimination case, the court must engage in a two-part analysis in awarding attorneys' fees. *Id.*

> First, the court asks whether the claims upon which the plaintiff failed to prevail were related to the plaintiff's successful claims. If unrelated, the final fee award may not include time expended on the unsuccessful claims....
>
> [R]elated claims will involve a common core of facts or will be based on related legal theories.... Thus, the test is whether relief sought on the unsuccessful claim is intended to remedy a course of conduct entirely distinct and separate from the course of conduct that gave rise to the injury upon which the relief granted is premised.

*Id.* (quotations and citations omitted); *see also Hensley v. Eckerhart*, 461 U.S. 424, 434–45, 103 S.Ct. 1933, 1940–45, 76 L.Ed.2d 40 (1983).

Odima satisfies this first test because his unsuccessful state tort claims are "related to" his successful Title VII and section 1981 claims. As the district court found, all of Odima's claims arose from a common core of facts—his employment relationship with Westin. To prove the discrimination claims pursuant to Title VII and section 1981, Odima had to present evidence of his work environment, his relationship with his superiors, his interactions with the Human Resources staff, his efforts to advance and the impact of Westin's discriminatory practices. Odima's state tort claims for retaliation, constructive discharge, and wrongful termination required virtually the same evidence. Thus, we cannot say that the course of conduct that Odima alleged in his state law claims was "entirely distinct and separate" from the course of conduct alleged in Odima's Title VII and section 1981 claims.

Having satisfied the first test,

then the court must apply the second part of the analysis, in which the court evaluates the "significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." If the plaintiff obtained "excellent results," full compensation may be appropriate, but if only "partial or limited success" was obtained, full compensation may be excessive. Such decisions are within the district court's discretion.

*Thorne*, 802 F.2d at 1141 (quoting *Hensley*, 461 U.S. at 435–37, 103 S.Ct. at 1940–41).

We cannot conclude that the district court abused its discretion in determining that "Plaintiff has sufficiently recovered in this action to justify an award of fees based upon all of the work reasonably performed by plaintiff's counsel in their representation of plaintiff." As the district court noted, Odima "prevailed on his claims that he was discriminated against in his employment by Westin because of his race and national origin. He was awarded reentry employment, backpay and prejudgment interest. In addition, he was awarded compensatory damages under 42 U.S.C. § 1981."

Westin next challenges the district court's enhancement of the attorneys' fee award. The district court first multiplied counsel's hourly rate by the number of hours they worked to determine the lodestar figure.[10] The court then enhanced by fifty percent only the fees charged by Carole Summers and Richard McKee. The district court stated that although

> contingency in and of itself is not a sufficient reason for such an award, ...
>
> [w]hat warrants a partial enhancement in this matter are the extraordinary services rendered by Mr. McKee and Ms. Summers. They were brought into the case two weeks before trial. Their client had lost his file (it had been stolen when his car was stolen). They were confronted by a visiting judge about whom they knew nothing. They did so with no discovery (hooray), no tentative or implied requests for additional time.... As I have earlier said, they responded to this assignment in

10. The district court disallowed some hours as duplicative.

accord with the highest traditions of the Bar.

■ Odima bears the burden of proving that the lodestar is an inadequate measurement of fees. *Blum v. Stenson,* 465 U.S. 886, 898, 104 S.Ct. 1541, 1548–49, 79 L.Ed.2d 891 (1984). The Supreme Court has approved of enhancements to the lodestar figure in certain circumstances; however, it has cautioned lower courts not to "double count." *Id.* at 899, 104 S.Ct. at 1549. In *Blum,* the district court had enhanced the fees, referring to "the complexity of the litigation, the novelty of the issues, the high quality of representation, [and] the 'great benefit' to the class." *Id.* at 898, 104 S.Ct. at 1548. The Supreme Court reversed. The Court examined counsel's hourly rates and, noting that they were at the upper end of the market, *id.* at 900, 104 S.Ct. at 1549, concluded that the factors upon which the district court relied were already reflected in the lodestar amount.

Here, the district court did not set forth sufficient information for us to determine whether the district court's enhancement comports with *Blum.* In accordance with *Blum,* we can speculate that the lodestar amount was an inadequate measurement simply because counsel had only two weeks in which to prepare for trial. Thus, even if counsel billed every hour of those two weeks, their fees might have been considerably lower than they would have been had counsel been provided with more time to prepare. We can also speculate that, because trial counsel had graduated from law school a mere seven months before trying this case, their hourly rate might not adequately reflect the skill they displayed in this trial. Speculations aside, we do not have before us the information on which to base such determination; thus, we must remand to the district court for further findings on this point.

## VII

In summary, we affirm the district court's finding that Westin violated Title VII in refusing to transfer Odima to the Night Auditor, Accounts Receivable or Purchasing and Receiving positions. We also affirm the district court's finding that Westin violated 42 U.S.C. § 1981 in refusing to transfer Odima to the Purchasing and Receiving position. However, we reverse the district court insofar as it found that Westin's refusal to transfer Odima to the Night Auditor or Accounts Receivable positions violated section 1981. As a result, we must remand to the district court for a possible redetermination of compensatory damages under section 1981. As to the other remedies awarded by the district court, we affirm except as to the fifty percent enhancement of attorneys' fees as to which we remand for further findings.

AFFIRMED in part, REVERSED in part, and REMANDED. Appellee is awarded costs and attorneys' fees on appeal.