106 F.3d 406
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Joe R. ABEYTA, Plaintiff-Appellant,
v.
William J. PERRY, Secretary of Defense, Defendant-Appellee.
 No. 95-35425.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Aug. 7, 1996.
Decided Jan. 23, 1997.
 
 Before: ALARCN, NORRIS and KLEINFELD, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Joe R. Abeyta appeals from the order granting summary judgment in this Title VII action in favor of William J. Perry, who was sued in his official capacity as Secretary of Defense ("the Secretary"). Abeyta alleged in his complaint that he was discriminated against because he is an Hispanic American. He contends that the district court erred in concluding that he failed to demonstrate that there is a genuine issue of material fact in dispute that, if found in his favor, would support a judgment for a violation of 42 U.S.C. § 2000(e).
 
 
 3
 He asserts three discrete theories in support of his discrimination claim:
 
 
 4
 One. He was denied his statutory return rights following his two-year rotation to another position within the Department of the Navy.
 
 
 5
 Two. He was denied an appointment to the position of Depot Deputy Director of the Defense Distribution Depot at the Puget Sound Naval Supply Center in retaliation for the filing of an Equal Employment Opportunities claim against Captain Fenwick and John Bell of the Naval Supply Center.
 
 
 6
 Three. The Secretary's reasons for appointing a person who is not a Hispanic American to the position of Deputy Director of the Defense Distribution Depot at Puget Sound are pretextual.
 
 
 7
 The Secretary filed a motion for a summary judgment supported by evidence that legitimate business reasons were the sole motivation for the failure to appoint Abeyta as the Deputy Director of the Defense Distribution Depot at Puget Sound. The district court concluded that Abeyta failed to proffer evidence that demonstrates that the Secretary's motivation in choosing another applicant is pretextual.
 
 
 8
 Because we have concluded that this appeal does not meet our standards for publication, we have not summarized the historical facts that preceded the filing of this action as they are well known to the parties. Instead, we discuss each of Abeyta's contentions, and the facts pertinent thereto, under separate headings.
 
 
 9
 We review an order granting summary judgment de novo. We must consider the facts in the light most favorable to the nonmoving party to determine whether there is a genuine issue of material fact in dispute. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir.1995), cert. denied, 116 S.Ct. 1261 (1996). We must affirm if the nonmoving party fails to meet its burden of producing facts "sufficient to establish the existence of an element essential to that party's case," Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). We affirm because we conclude that Abeyta failed to present facts in opposition to the motion for a summary judgment that would support a judgment in his favor on the question whether he was discriminated against because he is an Hispanic American.
 
 
 10
 * THE RETURN RIGHTS THEORY
 
 
 11
 Abeyta first argues that he established a claim of disparate treatment by demonstrating "(1) that he is Hispanic; (2) that his employer, the DLA, refused to honor his Return Rights to a job for which he was qualified; and (3) others not in his protected group were treated more favorably." We disagree.
 
 
 12
 In carrying out our independent review responsibility, we have read the entire record. We find no evidence that Abeyta received different treatment with respect to his return rights than individuals not in his protected class. Abeyta contends that "three other persons on overseas rotation received more favorable treatment when DLA honored their Return Rights." However, the sole evidence Abeyta submitted to support this contention is his declaration which states, "I reviewed the names of all employees (six), who in the last seven years to present (January 1995), went overseas and exercised return rights.... That I found I was the only minority and the only one who was not returned to my old position which still existed and the only one who had to compete for my own position." Abeyta then references a list which identifies himself and five other individuals. The list states that the other five individuals were returned to the "same position." The list further states that Abeyta was returned to the "same position," but that he "was never allowed to function in the position." Abeyta does not explain who wrote the list,[1] the basis for his knowledge that other returning employees were given the "same position," or what criteria he used in determining that the positions were the "same." Abeyta presented no evidence regarding the nature of the individuals' positions prior to and after their return, or if the Defense Logistics Agency transition had an impact on the positions. Without this evidence, it is impossible to determine whether the treatment Abeyta received upon his return was less favorable then the treatment given to other individuals. Accordingly, Abeyta wholly failed to establish a prima facie case of disparate treatment based on his assertion that the Secretary accorded him less favorable return rights than those accorded to other returning employees.
 
 
 13
 The majority of Abeyta's argument is directed at asserting that the Secretary refused to honor his return rights. Abeyta also contends that the Secretary's reason for purportedly denying him his return rights--i.e., that Abeyta's position was eliminated in the Defense Logistics Agency transition--is pretextual. The Secretary asserts that the Department of Defense substantially complied with the return rights agreement by placing Abeyta in a position with the same pay, grade, series, status, tenure, and seniority. The Secretary also argues that the Department of Defense had no duty to return Abeyta to his former position as a civilian employee of the Navy because it was abolished as a result of the consolidation. We need not resolve these questions, however, because Abeyta did not file a separate claim for breach of the return rights agreement. Similarly, in the absence of proof that Abeyta was treated differently from other returnees, whether the Secretary honored Abeyta's return rights is irrelevant to Abeyta's claim of disparate treatment.
 
 II
 THE RETALIATION THEORY
 
 14
 Abeyta argues that he was denied the position of Deputy Director of the Defense Distribution Depot at Puget Sound in retaliation for the fact that he had filed an Equal Employment Opportunities discrimination complaint on May 10, 1989 against Captain Fenwick and John Bell, the military and civilian heads of the Naval Supply Center. In his EEO complaint, Abeyta alleged that they ordered him to rotate his Naval Supply Center position with two other persons to deny him an upgrade to a GM-14 because he is an Hispanic American. Abeyta's EEO claim was settled.
 
 
 15
 To establish a prima facie case of discriminatory retaliation, Abeyta must demonstrate that: "(1) he engaged in activity protected under Title VII, (2) his employer subjected him to an adverse employment action, and (3) the employer's action is causally linked to the protected activity." Jurado v. Eleven-Fifty Corp., 813 F.2d 1406, 1411 (9th Cir.1987). The record does not reflect a causal nexus between Abeyta's 1989 EEO complaint against the Navy and the alleged adverse employment action by the Department of Defense in 1992. We have held that timing is a consideration in establishing the causation element of a prima facie case. Miller v. Fairchild Ind., Inc., 885 F.2d 498, 505 (9th Cir.1989), cert. denied, 494 U.S. 1056 (1990). In Miller, we reasoned that a 42 day or 59 day period between an EEOC action and an employee discharge would support a reasonable jury's finding of a retaliatory firing. Id. Here, three years elapsed between the EEO action and the alleged retaliatory conduct. The passage of three years is well beyond the time delay we recognized as appropriate in Miller.
 
 
 16
 The record also reflects that the Naval Supply Depot officials involved in the 1989 EEO proceedings did not discuss Abeyta's 1989 EEO complaint with Colonel LaBounty and Eudith Hendrix, the Department of Defense officials responsible for the selection of the Deputy Director of the Defense Distribution Depot at Puget Sound. The Secretary filed a declaration in support of the motion for summary judgment which alleges that the Navy was not in the Defense Distribution Region West's chain of command and "has no influence on [the Defense Distribution Region West's] managerial decisions." Hendrix alleged in his declaration that he was "only vaguely aware that Mr. Abeyta had filed an EEO complaint against the Navy, but had no, and still ha[s] no specific knowledge of the issues of the complaint." At the time of the selection process, Eudith Hendrix was the Director of Defense Distribution Headquarters, Region West of the Defense Logistics Agency. His office was in Stockton, California.
 
 
 17
 The record does not reflect a causal connection between Abeyta's 1989 EEO action and the Defense Logistics Agency's alleged retaliatory hiring decision in 1992. Thus, Abeyta has failed to establish a prima facie case of retaliatory discrimination by his employer.
 
 III
 THE DISPARATE TREATMENT THEORY
 
 18
 Abeyta also contends that the district court erred in concluding that he failed to prove that the reason that Blackwood was selected for the position of Deputy Director of the Defense Distribution Depot at Puget Sound was pretextual. The Secretary conceded before the district court that Abeyta had established a prima facie case that the Secretary discriminated against him under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), when Hendrix failed to select him for the position of Deputy Director. The Secretary did not argue that Abeyta was unqualified for the position. Instead, the Secretary offered evidence that the selection of Blackwood was based on his experience with the Defense Logistics Agency, and not as the result of bias against Hispanic Americans.
 
 
 19
 The Secretary presented evidence in support of his motion for a summary judgment that Blackwood was selected over the other applicants "primarily because of his DLA experience during the pre-consolidation and transition periods." During this period, Blackwood had acquired a "background in the DLA's way of doing things that [Abeyta had not]." He was "involved in the planning for the consolidation ... and was familiar with DLA and [Defense Distribution Region West] operations, procedures, policies, work practices, and management philosophy."
 
 
 20
 Abeyta did not present any evidence to rebut the Secretary's evidence that Blackwood was selected over the other applicants because of his experience in performing the duties of the position, in light of his on-the-job training as the acting Deputy Director of the Defense Distribution Depot at Puget Sound. Contrary to Abeyta's contention that Hendrix used subjective criteria in selecting Blackwood, the record shows that Blackwood was selected based primarily on the experience he gained working with the Defense Logistics Agency as acting Deputy Director. The fact that Blackwood gained on-the-job experience is an objective criterion. It is undisputed that the official job description for Abeyta's former position as Deputy Director of the Distribution Department at the Puget Sound Naval Supply Center, and the Defense Logistics Agency position of Deputy Director of the Defense Distribution Depot at Puget Sound are similar. It is also uncontroverted, however, that the position of Deputy Director of the Defense Distribution Depot at Puget Sound included expanded responsibilities over additional branches of the military. The Deputy Director reports directly to the Commanding Officer of the Defense Distribution Depot. Furthermore, the Deputy Director makes policy decisions. In his position with the Navy, Abeyta was limited to implementing the policy decisions of others.
 
 
 21
 Abeyta did not have experience comparable to Blackwood's during the transition period, following the consolidation, nor in the operations, policies, procedures, work practices, and management philosophy of the Defense Logistics Agency. Blackwood's actual performance of the duties of the position of Deputy Director of the Defense Distribution Depot at Puget Sound gave him an obvious advantage over his competitors for the position in responding to Hendrix's questions during the oral examination. The added weight given to Blackwood's experience, however, does not demonstrate invidious discrimination against Abeyta because he is an Hispanic American.
 
 
 22
 The Secretary presented evidence that the Defense Logistics Agency "viewed [Blackwood's] DLA experience as critical to the selection process." Abeyta failed to meet his burden of producing specific facts in opposition to the motion for summary judgment that the evidence presented by the Secretary for selecting Blackwood is pretextual. See Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586-87 (1986) ("[w]hen the moving party has carried its burden ... the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial' ").
 
 
 23
 Abeyta argues that he has demonstrated that he is entitled to a trial on the merits because the record shows that his educational qualifications were superior to Blackwood's. Accepting this proposition as true, evidence of Abeyta's academic qualifications does not satisfy the requirement that he present specific facts that demonstrate that Blackwood did not possess superior experience for the position of Deputy Director of the Defense Distribution Depot at Puget Sound, or that his selection was a pretext to mask discrimination against Abeyta because he is an Hispanic American. Abeyta has failed to meet his burden of coming forward with evidence that the Secretary's selection of Blackwood for the position of Deputy Director was motivated by an anti-Hispanic American animus.[2]
 
 
 24
 AFFIRMED.
 
 
 25
 NORRIS, Circuit Judge, dissenting.
 
 
 26
 Because I believe there is a genuine issue of material fact regarding whether the Secretary's reason for hiring Blackwood instead of Abeyta was pretextual, I dissent.
 
 
 27
 The Secretary claims it selected Blackwood instead of Abeyta because Blackwood had DLA experience while Abeyta had only Navy experience. Appellees' Brief at 13-14; Clerk's Record ("CR") 20 at p 2(e), (j). The majority accepts this proffered distinction as legitimate and nondiscriminatory, then rejects Abeyta's evidence of pretext as insufficient to defeat the Secretary's motion for summary judgment.
 
 
 28
 It is undisputed that Abeyta's Navy credentials are superior to Blackwood's,[1] but whether Abeyta's Navy credentials make him at least as qualified for the DLA position as someone like Blackwood with DLA experience, depends in part on how similar the Navy and DLA positions are. Contrary to the majority's view, Abeyta presents concrete evidence vigorously controverting the Secretary's claim that the DLA position includes "expanded responsibilities over additional branches of the military." See Mem.Dispo. at 8. As even the majority recognizes, the DLA and Navy positions share the same official job description. Id.; see CR 33 "A" Abeyta at p 28 & Exh. 26. In fact, the "job summary" on the "Job Opportunity Announcement" for the DLA depot deputy director position was copied verbatim from the job description for Abeyta's old job, except the word "Navy" was omitted. Compare CR 38 Deposition of Dale R. Cruz at Exh. 9, with CR 33 "A" Abeyta at Exh. 26. Moreover, both the DLA and Navy positions are rated on a G-13 pay scale. CR 33 "A" Abeyta" at p 28. This undisputed evidence alone creates a genuine issue of material fact regarding whether the DLA and Navy positions are sufficiently different to justify the Secretary's decision to hire someone with a few months of DLA experience over someone with extended and distinguished experience of the same character in the Navy.
 
 
 29
 Even if the undisputed evidence were not enough, Abeyta offers more evidence to meet his burden on summary judgment. Abeyta submits a declaration from a former Navy Staffing and Classification Specialist to contest the Secretary's claim that the DLA position is "three levels higher in the hierarchical chain" than the Navy position was. CR 33 Reed at 14-16. The declaration attests that both the Navy and DLA positions involved supervision of the same number of employees and authority over receiving, storage, and issuing divisions. Id. at 15. The only difference in supervisory responsibility between the DLA position and Abeyta's former job, according to this declaration, is that Abeyta's old position involved the supervision of 20 more employees and one additional division. Id. at 14-15. To support his argument that his experience in the Navy is at least equivalent to Blackwood's experience in the DLA for purposes of determining who is qualified for the DLA position, Abeyta presents evidence that DLA employees involved in the selection process rated Abeyta "well qualified" for the position of DLA depot deputy director, while they rated Blackwood one notch lower, as "qualified." This evidence undermines the majority's finding of fact that "Abeyta did not have experience comparable to Blackwood's." See Mem.Dispo. at 9. On this record, such a finding can be made only by a trier of fact after trial. In sum, the evidence clearly creates a genuine dispute whether Abeyta was at least as qualified as Blackwood for the DLA position, and therefore whether the Secretary used Blackwood's DLA experience as a pretext to hide its discriminatory intent.
 
 
 30
 Abeyta's claim is furthered strengthened when considered in light of the following facts: the DLA honored the return rights of other non-minority Navy employees who went overseas during the transfer of functions from Navy to DLA[2]; an internal DLA Civilian Personnel Management Evaluation found that Hispanic employees believed they had been subjected to unfair disciplinary action, and to unequal treatment in temporary promotions, details, and performance awards, CR 34 "B" Butler, "PME" Tab at pp. 14-15; and there is only one Hispanic deputy director and one Hispanic acting deputy director in the DLA, CR 20 at 71-74.
 
 
 31
 Viewing the evidence in the light most favorable to Abeyta, as we must do on summary judgment, I believe Abeyta has presented evidence from which a trier of fact could find discriminatory intent. It could find that Abeyta's more extensive experience in the Navy objectively outweighed Blackwood's brief exposure to DLA practices, and that the Secretary's contention that the positions were "by no means" comparable does not ring true. A trier of fact could find that even Blackwood believed the DLA and Navy positions were the same, as he noted in a letter to Abeyta sent four days before the transfer of functions from Navy to DLA: "[Y]our position is still called deputy director" and "I will try to keep the 'seat' warm for you." CR 33 "A" Abeyta at Exh. 18. The evidence suggests more than an incorrect, good faith decision by the Secretary to select Blackwood instead of Abeyta; rather, it would support a finding of fact that the Secretary's proffered nondiscriminatory reason for selecting Blackwood--Blackwood's greater DLA experience--is based on an exaggerated distinction between the DLA and Navy positions.
 
 
 32
 In conclusion, I believe Abeyta has presented a genuine issue of material fact regarding his disparate treatment discrimination claim.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 The list appears to have been prepared by Abeyta or his attorney to supplement Abeyta's declaration
 
 
 [2]
 Abeyta also argues that, "[u]pon rejecting a Title VII claim under Fed.R.Civ.P. 6(c), the district court is obligated to 'make specific findings of fact with regard to each proffered explanation' the defendant offers to rebut the plaintiff's prima facie case." Appellant's brief at 15 (citing Odima v. Westin Tucson Hotel Co., 991 F.2d 595, 600 (9th Cir.1993)). Rule 6(c) was repealed in 1966. Abeyta's reliance on Odima is also misplaced. Odima held that a district court must issue findings of fact after a matter is tried without a jury. See Fed.R.Civ.P. 52(a). We have previously held that a district court is not required to set forth specific factual findings in a summary judgment proceeding. Underwager v. Channel 9 Australia, 69 F.3d 361, 366, n. 4 (9th Cir.1995)
 
 
 [1]
 Abeyta had 10 more years of Navy deputy director experience, 6 more years of DOD supply operations experience, and 10 more years as a Navy second level supervisor. Moreover, Abeyta received the Meritorious Civilian Service Award twice, while Blackwood was named manager of the quarter twice; and Abeyta had an AA Degree while Blackwood had only 57 semester hours. CR 33 Reed at 19
 
 
 [2]
 The majority errs when it states that the "sole evidence" Abeyta submits to support this claim is his own declaration. Abeyta submits an interview conducted as part of the investigation into his 1989 EEO complaint, where a non-minority Navy employee who went overseas in February 1991 stated that "DLA honored my 'Right to Return,' " and placed her in the same job she had left. CR 34 "B" Butler, "Caver" Tab at p. 6 & Exh. 30. In addition, Abeyta presents a declaration from a Navy staffing specialist stating that DLA honored the return rights of four other non-minority employees--Dennis Wells, James Twogood, Jacqulyn Keifert, and Dave Ulland--who transferred overseas prior to consolidation. CR 33 Reed at 12. Even so, a party's own declaration is evidence that may defeat summary judgment